N'W YORK,<br>
Sept. 1800.<br>
The People<br>
v.<br>
Croucher.

## OYER AND TERMINER.

### NEW YORK, SEPTEMBER, 1823.

| | |
|---|---|
| *The People* <br> vs. <br> *Jeremiah Ryan.* | } MURDER. |

Present—Honourable *Ogden Edwards,* Circuit Judge.
Honourable *Richard Riker,* Recorder.
Aldermen *Zabriske, Mann, Taylor* and *Mead.*

*Hugh Maxwell,* District Attorney, for the People.
*William M. Price* and *David Graham,* for the Pris-
oner.

The prisoner was put to the bar for trial, on an in-
dictment for the murder of David Findlay. on the 16th
of October, 1822.

N'W YORK, Sept. 1823.

The People v. Ryan.

The panel was called, and Mr. Nehemiah Merritt objected to being sworn on the jury. The ground of his objection was, that he belonged to the society called Quakers, the tenets of whose religion would not justify taking the life of any human being for any crime. On the authority of Palmer's case, (City-Hall Recorder, tit. *Challenge*,) he was unqualified to serve on the jury in a capital case.

John F. Sibell was called, who did not belong to the society of Friends, or Quakers, but who nevertheless had conscientious scruples against finding a verdict that would put in jeopardy the life of the prisoner.

Form of Challenge.

He was challenged by the counsel for the people, for "that John F. Sibell does not stand indifferent between the people of the state of New York and Jeremiah Ryan, the prisoner at the bar, and assigns for special cause, in support of the challenge to the said juror, that he cannot conscientiously find a verdict for the people which in its consequences takes away life."

To this challenge the counsel for the prisoner demurred.

The court decided against the demurrer, and the juror was sworn and took his seat.

Maxwell, District Attorney, opened the case on the part of the people; he stated that the fact charged in the indictment would be proved principally by two witnesses; and that, unless the jury could discover some circumstances of mitigation, which reduced the grade of the offence,

they must pronounce it to be *murder*. He then proceeded to state the law upon this subject, and read authorities to show the distinction between murder, manslaughter, and excusable and justifiable homicide. All homicide was taken *prima facia* as malicious, and, therefore, murder, unless it was proved to be otherwise; and the burden of that proof rested on the accused. He pointed out the distinctions between malice express and implied, and showed from what circumstances malice might be inferred. The most material distinction established by these cases was the following :—If a man surprised another in the act of adultery with his wife, and killed him instantly on the spot, the law pronounced such killing to be manslaughter ; but if the stranger was attempting a rape, and the wife cried out, and the husband entered and killed him, it was justifiable homicide *se defendendo ;* nor could the consent of the wife, if in the presence of the husband, alter the offence from a rape ; but if the adulterous act had been committed, and the husband, after time intervening sufficient for reflection, attacked and killed the adulterer out of revenge, the killing in such case is murder. Great as was the injury, the sufferer might not take revenge into his own hands. Vengeance belonged to God, and punishment to the law. The district attorney then proceeded to present the general outlines of the case, and concluded by presenting to the jury the turning point of the cause, which was, whether the prisoner killed the deceased while attempting to violate his wife ; or whether, such violation having previously occurred, there had been a sufficient interval for his mind to become cool. In the former case, the act would be murder : in the latter, it would be manslaughter only.

N'W YORK,
Sept. 1823.

The People
v.
Ryan.

4 Blac. Com.
198. 1 Hale,
448. 3 Chitty's C. L. 930.
1 Hale, 485,
486. Foster,
296.

The witnesses for the prosecution were, David Gotrey, a man who lived in the same house with the prisoner; Alexander Bryant, the watchman who apprehended him; Marinus Willet, jun., the physician who examined the deceased.

The witnesses for the prisoner were, George and John Lovett, persons for whom the prisoner had worked, and one of them his landlord; William Young, who lived in the same house with the deceased; .and Samuel I. Camp, another watchman.

The prisoner's examination before the police was also read.

The facts of the case, as elicited from the examination of these witnesses, appeared to be the following :

Ryan, the prisoner, was a laborer, living in. Delancey-street, at the corner of Lewis-street, and occupying a front room on the ground floor. He had a wife of the worst character, and three children. He was of a remarkably mild and peaceable disposition, (so much so as to be called, by a witness, " *too soft*,") very industrious, honest, and sober, an indulgent husband, and a most affectionate parent. His wife was addicted to liquor, neglectful of her children, and too fond of the company of another man—the man who was killed. Ryan suspected her on this latter ground, and was very unhappy. They had frequently quarrelled, his wife being, when intoxicated, very noisy and turbulent, and often beating him. She had, however, promised to amend, and for a time abstained from visiting the deceased, to whose

room she had been in the habit of going almost daily

for months together, while her husband was out at his work. Some time, however, before the fatal night, this criminal, or at least highly suspicious, intercourse had been renewed. If the prisoner's testimony at the police is to be relied on, the following distressing circumstances had taken place on the evening preceding the deed. Ryan had come home from his labor, and found his children (one but a year old) crying on the floor, their mother having gone out and left them. After making a little fire to cook their supper, suspecting where she was, he went to Finley's room, which was up stairs, and knocked at the door. He heard his wife's voice within, and the door was fast; after some delay the door was opened; he entered, and found two men there, but his wife was gone. He turned away; and while talking with the man below, saw his wife come down the stairs: she was a little intoxicated, and they went home together. At home she asked him for money; he refused it, lest she might spend it for liquor. She said she knew where she could get it, and, taking up her child, went out. He remained at home some time; but about 10 o'clock went again to Finley's, and, looking through the key-hole, saw his wife lying on the floor, with Finley's arms round her neck; her child lay beside her. He knocked for admittance: Finley opened the door, and he demanded his child. Finley dragged him into the room, attempted to be jocular, and insisted on his drinking, as a condition of delivering up the child. The wretched man complied, and, after much altercation, received his child and came away, his wife (much intoxicated) and Finley accompanying him.—[These facts rest on his sole testimony; those which follow are derived from the wit-

nesses.]—The whole party entered Ryan's house about 12 o'clock at night, on the 14th of October, 1822. The men were not quarrelling, but the woman was so noisy that Gotrey, the man in the back room, who was then sitting up watching a sick daughter, went out to get the watch ; but not succeeding,‘returned to his room, where he lay down on the bed, and fell asleep; there was a light, but no noise, in Ryan's room. About one o'clock, as he thought, but in reality near three, he was roused by the voice of Ryan calling out, Mr. Gotrey! Mr. Gotrey!—between each Mr. Gotrey, and cry, he heard heavy blows, apparently inflicted with a rattling instrument of metal on some soft substance. He got up, and ran up stairs to call his son-in-law, to come down and go with him into Ryan's room. Some time was spent in putting on part of his clothes, and when they together reached the bottom of the stairs, a watchman (Bryant) entered the front door, having Ryan in custody. The door of Ryan's room being open, a scene of petrifying horror presented itself : The candle, nearly burnt out, stood upon the table ; the wife, apparently asleep, her clothes on, and her child beside her, lay on a bed, which was upon a bedstead in the corner; and upon another bed, in the middle of the floor, more than three feet from the bedstead, lay the body of Finley, horribly mangled, and in a gore of blood, but still alive. It lay on the right side, lengthwise of the bed, and in the middle of it, as one would have lain in a bed who was asleep in it—the head sunk down in a hollow, the upper or left side of the head beaten in ; the cheek bone shattered, the ear ·cut open, the whole head surrounded with a· deep pool of blood, which was running in at the mouth—the mouth occasionally gaped ; the bones of the left hand broken

N'W YORK,
Sept. 1823.

The People
v.
Ryan.

to pieces: the entire bed was afloat with blood, and blood was running in streams from the bed over almost the whole floor. His coat was off, and lay on the floor; his other clothes on: his shirt sleeves were red, and soaked with blood; and, according to one witness, his shoes were off. About six inches from his head lay an iron tongs, covered with blood, and having particles of flesh still adhering to it. On entering the room with the watchman and Gotrey, Ryan said, *"there he lies: I killed him, and I meant to kill him—and I'm willing to be hanged for it."* The watchman, it appeared, had been passing near, and, hearing the blows, had stopped; hearing them continued, he went up on the stoop, and as he put his hand upon the handle of the front door, Ryan opened it from within, sprang past him, fell, recovered his feet, and ran swiftly up Delancey-street, toward Manhattan Island. The watchman pursued, overtook and seized him; on which he said, *"I killed him, and I meant to kill him; he has deprived me of my wife, and I have deprived him of his life. I am willing to suffer for it."* On their way to the watch-house, he attempted to escape, but at the watch-house he again made the same confession. On his way to the police office, he made two attempts to escape, but finding the watchman too strong for him, offered him a bribe of ten dollars. No efforts were made to recover the wounded man; who, before morning, crawled from off the bed under a sort of sofa, in one corner of the room, and was found there by a witness, alone, on his hands and knees. Next day he was removed to his own house in a blanket, and thence on the sick hearse to the hospital, where, in the night, he died. He was a weakly man, of nearly sixty years old—had once been wealthy, and owned five ships, but was re-

duced, and earned his bread by winding cotton balls. The man in the house with him thought that his misfortunes had in some degree injured his intellect. He lived in Broom-street.

Mr. Sampson opened the defence of the prisoner; and his case was summed up by Messrs. Graham and Price, who were followed by Mr. Maxwell, for the prosecution. The reporter has not room to do justice to their abilities, by even a transcript of their arguments, which were very lengthy.

The court left it to the jury, under all the circumstances of the case, whether the crime charged upon the prisoner was murder or manslaughter, or justifiable homicide; and observed, if the jury were of opinion that the prisoner committed the act while the deceased was in criminal intercourse with his wife, it would not be murder, nor even manslaughter, but would be justifiable homicide, *se defedendo.* Her consent would be of no avail to increase or extenuate the crime, if in the husband's presence. If, however, the jury should believe there was a criminal connection between the deceased and the wife of the prisoner, as there was no positive, although there was presumptive evidence of it, it would be for them to decide, from the circumstances, whether the homicide was committed after time for reflection had been given or not. The court recognized the rules laid down by the District Attorney in his opening to the jury.

The jury found the defendant guilty of *manslaughter.* And he was sentenced to the state prison fourteen years.